IN THE SUPREME COURT OF TENNESSEE

AT NASHVILLE

FILED

March 8, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

FOR PUBLICATION

Filed:  March 8, 1999

TERI MICHELLE PARKER,                )
                                     )        HOUSTON CHANCERY
            Appellant,               )
                                     )
                                     )
Vs.                                  )        HON. ALLEN W. WALLACE,
                                     )              CHANCELLOR
                                     )
RICHARD KEN PARKER,                  )
                                     )
            Appellee.                )        No.  01S01-9704-CH-00085

For Appellant:                        For Appellee:

Robert Clive Marks                    Laurence M. McMillan, Jr.
MARKS, SHELL, MANESS & MARKS          CUNNINGHAM, MITCHELL, HICKS,
Clarksville, Tennessee                 BROLLIER & McMILLAN
                                      Clarksville, Tennessee

# O P I N I O N

AFFIRMED                                              ANDERSON, C.J.

We granted the appeal in this child custody case to determine whether the trial court erred in admitting expert testimony regarding the effects of an interracial relationship on the child and in later excluding the trial court's comments from the statement of evidence.

The Court of Appeals held that the trial court erred in considering the improper testimony and later excluding a comment it made from the record. The court further held, however, that the trial court's decision awarding custody to the father was properly supported by evidence in the record.

After reviewing the record and applicable authority, we agree with the Court of Appeals that the trial court erred in admitting the race-based testimony and in excluding its comment from the record. Notwithstanding these errors, however, we conclude that the evidence in the limited record before this Court does not preponderate against the trial court's grant of custody to Richard Parker. The judgment is therefore affirmed.

## BACKGROUND

### Statement of Evidence

Teri Parker and Richard Parker were married in 1988, and they had a son, Dylan, in June of 1992. In July of 1993, Teri Parker filed for divorce alleging inappropriate marital conduct, and Richard Parker counterclaimed alleging inappropriate marital conduct and irreconcilable differences. Both parties sought custody of the minor child.

There was no transcript of the trial, but according to the parties' written statement of evidence from recollection as approved by the trial court, the witnesses testified substantially as follows. Teri Parker testified that she worked as a nurse for Dr. Sidberry. She had custody of Dylan during the period in which she and Richard Parker were separated. Dylan was enrolled at the Mulberry Bush Day Care Center and was

also cared for by babysitters and family members while Teri Parker worked. She testified that she had always supported, cared and provided for Dylan.

Teri Parker denied that she had an affair or sexual relations with Dr. Sidberry, who is African-American. She conceded that they were good friends who occasionally would see one another outside of work. She denied that Dr. Sidberry had visited her at her apartment or engaged in any "inappropriate" conduct. She later admitted, however, that Dr. Sidberry had visited her at home on one occasion to treat Dylan for a cold.

Gail Scism, Teri Parker's mother, testified that Teri was a good mother and had provided for Dylan. She had asked Teri on one occasion about her relationship with Dr. Sidberry, and Teri said they were only friends. She conceded that she once said she would try to get custody of Dylan if in fact Teri was having an affair with Dr. Sidberry, "because [she] would not want him in that environment." Scism reiterated, however, that Teri was a good mother to Dylan.

Richard Parker testified that he works in construction and had arranged to work hours convenient for caring for Dylan. He said that his mother and other family would assist him in caring for Dylan as well. He suspected that Teri Parker had been having an affair with Dr. Sidberry, which he believed interfered with her care of Dylan. Richard Parker claimed to be the primary caretaker and provider for Dylan during the period of separation. Several other witnesses testified that Richard Parker had been a caring and supportive father to Dylan.

A private investigator testified that he had been hired by Richard Parker. He discovered that Dr. Sidberry visited Teri Parker's apartment on three occasions, for an average of a couple of hours per visit. On one of the three occasions, Dr. Sidberry visited for four hours. A videotape of Dr. Sidberry visiting at Teri Parker's apartment was introduced into evidence.

Robin Phillips, a family nurse practitioner who trained under Dr. Sidberry, also testified about the purported relationship between Dr. Sidberry and Teri Parker. Phillips, when asked if it would be harmful for Dylan to be raised in this "environment," testified over objection that it would be "harmful." She stated that interracial relationships were more acceptable in larger cities, and that it may be harmful for a child "to be raised in an interracial household because of small town views."

The trial court ruled that custody of the minor child was governed by the law of comparative fitness and found both Teri and Richard Parker to be fit and proper parents. The trial court found that Teri Parker had lied, and that, whether or not there had been marital transgressions, her "primary concern" was for Dr. Sidberry. The trial court stated that the custody decision was not based on race, but that it was wrong for anyone to have a relationship with an employer. The trial court awarded custody to Richard Parker, and visitation to Teri Parker. One unrequested condition of visitation in the trial judge's order was that the child was to have no contact with Dr. Sidberry.

### Post-Trial Events

Teri Parker appealed the custody ruling. Since there was no transcript of the trial, the trial court held a post-trial hearing to reconcile differences in the parties' proposed statements of evidence from recollection. In alleging that the trial court's ruling had been affected by racial bias, Teri Parker proposed to include a statement allegedly made by the trial judge during the cross-examination of her mother, Gail Scism:

> She [Wife's mother] comes from the same school I do. She can't help the way she feels. Society today feels differently than the way we were brought up (this referred to the wife who is white, seeing Dr. Sidberry, who is black).

Counsel for Teri Parker argued that the parenthetical reference reflected the context in which the trial judge's statement had been made. The trial judge conceded that he had

-4-

made a similar statement but denied that there was any inference of racial bias as set forth in the proposed parenthetical:

> You can take the parenthesis out, I never referred to that. The Appellate Court can put any kind of interpretation they want to on it, but I am telling you, that's not my interpretation. That is not the way I intended it.

The court explained:

> Never did I -- and I do this in a lot of cases, I just have what children said. I have a -- am very much concerned with people, I guess for lack of a better term, shacking up. I am not referring to white and black. I am talking about people that live together without the benefit of marriage in front of children. No where did I ever mean -- referring to Dr. Seaberry [sic], that he was black, no where did I mean that. What I was talking about in that case and I think if you have a transcript you will find out that I was talking about people that just go out . . . and shacking up, with children. I am opposed to that. The lawyers who regularly practice in front of me know that. I don't think that it is good for children, and that is what I was referring to. No where did I ever make any comment -- it looked like to me ever since this trial started, has been trying to make effort to say that the Court has some objection [to] interracial associations. I don't care whether they are black, white, red or what they are, I am not going to allow children -- I don't allow children, some of them have to – to be around people that live together without the benefit of marriage. I am just opposed to it. And that is what I was referring to. No where did I ever intend nor do I even feel that way. So, I think it has been -- I don't know where this come [sic] from, but I probably made some kind of a statement in there about that.

When counsel for Teri Parker requested an opportunity to elaborate, the trial court said:

> No. If you are referring to interracial -- if you are referring to interracial, my concern about interracial marriages, interracial babies, you can forget it. I never said anything like that. I am talking about people that live in front of children, that's what -- that is what I am opposed to and I will tell you in a minute, and I don't care – the Appellate Court may think I am wrong, if they do, they can tell me. But it is just no good for children.

The trial court denied counsel's request to conduct an evidentiary hearing on the issue or to permit counsel to make an offer of proof. The trial court then approved the statement of evidence proffered by Richard Parker for use on appeal, which deleted the statements at issue.

On appeal, the Court of Appeals held that the trial court erred in refusing to permit the inclusion of his comments in the statement of evidence, but properly refused

to include the parenthetical information.  The appeals court further held that it was improper to admit the nurse practitioner's testimony about the "harmful" effects of an interracial relationship on a minor child.  The Court of Appeals nonetheless concluded:

> There is evidence in the record from which the trial court could conclude that Wife's extramarital relationship caused her to neglect the child.  Although this is denied by Wife, when an issue hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses that contradicts the trial court's findings. (Citation omitted).  Nothing in the record supports a finding that either parent is unfit.  Under the comparative fitness doctrine, however, a parent need only be relatively more "fit" than the other in order to be awarded custody.  Even considering the errors above, the preponderance of the evidence weighs in favor of the trial court's determination that custody by the Husband was in the best interest of the child.  Therefore, the trial court is affirmed on this issue.

## ANALYSIS

### Statement of Evidence

The threshold issue we must address is the sufficiency of the record on appeal, specifically, the statement of evidence from recollection of the parties.  Teri Parker contends that the trial court erred in excluding the statement it made during the cross-examination of Gail Scism, as well as in excluding the parenthetical information which provided the context for the statement.  She argues that the court should have held an evidentiary hearing or allowed a proffer of evidence to develop the issue.  Richard Parker contends that an evidentiary hearing was unnecessary because the trial court recalled the events and properly excluded the statement.

To resolve the issue we look to the Tennessee Rules of Appellate Procedure, which provide that if no verbatim report or transcript of the proceedings is available, preparation of the record may require a statement of evidence:

> If no stenographic report, substantially verbatim recital or transcript of the evidence or proceedings is available, the appellant shall prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement should convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal.  The statement, certified by the

appellant or the appellant's counsel as an accurate account of the proceedings, shall be filed with the clerk of the trial court within 90 days after filing the notice of appeal. Upon filing the statement, the appellant shall simultaneously serve notice of the filing on the appellee, accompanied by a short and plain declaration of the issues the appellant intends to present on appeal. Proof of service shall be filed with the clerk of the trial court with the filing of the statement. If the appellee has objections to the statement as filed, the appellee shall file objections thereto with the clerk of the trial court within fifteen days after service of the declaration and notice of the filing of the statement. Any differences regarding the statement shall be settled as set forth in subdivision (e) of this rule.

Tenn. R. App. P. 24(c). The rules further provide that "differences regarding whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by the trial court regardless of whether the record has been transmitted to the appellate court. Absent extraordinary circumstances, the determination of the trial court is conclusive." Tenn. R. App. P. 24(e).

As discussed by the Court of Appeals, resources for preparing an accurate statement of evidence and resolving any disputes include:

> (1) the memory of the trial judge, (2) memoranda of the trial judge, and (3) an evidentiary hearing to establish what evidence was presented during the trial. The third resource is seldom used, but, if used, and the evidence at such hearing is preserved on appeal, the appellate court might find some support therein for revision of the evidentiary record.

Hall v. Hall, 772 S.W.2d 432, 435 (Tenn. App. 1989); see also Beef N' Bird of Am., Inc. v. Continental Cas. Co., 803 S.W.2d 234 (Tenn. App. 1990). Here, the trial court said that a hearing was unnecessary because it recalled the events in question.

We agree with the Court of Appeals' determination that the trial court erred in excluding its comment that:

> She [Wife's mother] comes from the same school I do. She can't help the way she feels. Society today feels differently than the way we were brought up.

The record of the post-trial proceeding reflects that the trial court essentially conceded that it made a similar statement. Moreover, since the remarks were made in the course of the witness's testimony, it should have been included in the statement of evidence.

The post-trial hearing reveals that the trial court rejected the information counsel for Teri Parker had included parenthetically, i.e., "this referred to the wife who is white, seeing Dr. Sidberry, who is black." The parenthetical information, which was ostensibly to provide context for the trial court's comment, would not have appeared on the page of a written transcript or other verbatim record. Instead, the comment would have been made in the context of the proceedings as a whole, without parenthetical interpretations to guide the reviewing court. The Rules of Appellate Procedure provide that "[n]othing in this rule shall be construed as empowering the parties or any court to add to or subtract from the record except insofar as may be necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(g). Accordingly, we conclude that the trial court did not err in striking the parenthetical information.

**Race-Based Testimony**

We next turn to the issue of whether the trial court erred in allowing a witness to testify about the alleged harmful effects of an interracial relationship on a minor child. Teri Parker argues that the issue of race was injected into the proceeding and improperly considered by the court in making its custody decision. The appellee Richard Parker maintains that the trial court expressly denied using race as a factor and applied the appropriate factors governing child custody.

The appropriate factors governing child custody are set out below and exclude race. In a child custody case, the needs of the children are paramount. Lentz v. Lentz, 717 S.W.2d 876, 877 (Tenn. 1986). Every effort must be made to promote the child's interest by placing the child in an environment that will best serve his or her physical

-8-

and emotional needs.  See Luke v. Luke, 651 S.W.2d 219, 221 (Tenn. 1983).  Among

the relevant factors for consideration include:

> the age, habits, mental and emotional make-up of the child and those
> parties competing for custody; the education and experience of those
> seeking to raise the child; their character and propensities as evidenced
> by their past conduct; the financial and physical circumstances available
> in the home of each party seeking custody and the special requirements
> of the child; the availability and extent of third party support; the
> associations and influences to which the child is most likely to be exposed
> in the alternatives afforded, both positive and negative; and where is the
> greater likelihood of an environment for the child of love, warmth, stability,
> support, consistency, care and concern, and physical and spiritual
> nurture."

Gaskill v. Gaskill, 936 S.W.2d 626, 630 (Tenn. App. 1996) (quoting Bah v. Bah, 668

S.W.2d 663, 666 (Tenn. App. 1983)); see also Tenn. Code Ann. § 36-6-106 (1996 &

Supp. 1998).  In considering all of these factors, the court must undertake a

"comparative fitness" analysis by which it determines which of the available custodians

is comparatively more fit than the other.  Gaskill, 936 S.W.2d at 630; In re Parsons, 914

S.W.2d 889, 894 (Tenn. App. 1995).


In considering all relevant circumstances, however, a court may not consider the

effects or alleged effects of racial prejudice.  In Palmore v. Sidoti, 466 U.S. 429, 104

S. Ct. 1879, 80 L. Ed. 2d 421 (1984), the father sought a change of custody because

the mother, who was Caucasian, was living with an African-American man, whom she

later married.  The trial court made the following findings:

> It is of some significance . . . that the mother did see fit to bring a man into
> her home and carry on a sexual relationship with him without being
> married to him.  Such action tended to place gratification of her own
> desires ahead of her concern for the child's future welfare.  This Court
> feels that despite the strides that have been made in bettering relations
> between the races in this country, it is inevitable that [the child] will, if
> allowed to remain in her present situation and attains school age and thus
> more vulnerable to peer pressures, suffer from the social stigmatization
> that is sure to come.

466 U.S. at 431, 104 S. Ct. at 1881 (emphasis omitted).

-9-

On appeal, the United States Supreme Court observed that the trial court had made no other findings regarding the mother's fitness and that, therefore, the sole determining factor applied by the trial court was race. The Court began its analysis by observing that "[i]t would ignore reality to suggest that racial and ethnic prejudices do not exist" and that there "is a risk that a child living with a stepparent of a different race may by subject to a variety of pressures and stresses not present if the child were living with parents of the same racial or ethnic origin." 466 U.S. at 433, 104 S. Ct. at 1882. The Court concluded, however:

> The question . . . is whether the reality of private biases and the possible injury they might inflict are permissible considerations for removal of an infant child from the custody of its natural mother. We have little difficulty concluding that they are not. The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.

Id. (footnote omitted). The Court therefore held that "[t]he effects of racial prejudice, however real, cannot justify a racial classification removing an infant child from the custody of its natural mother found to be an appropriate person to have such custody." 466 U.S. at 434, 104 S. Ct. at 1882-83.

This Court is troubled by the interjection of race based testimony in these proceedings, which is so clearly prohibited in Palmore. The trial court allowed a nurse practitioner to testify as an expert regarding the alleged harmful effects upon a child from an interracial relationship. When counsel for Richard Parker made inquiries as to the racial issue in his cross-examination of Gail Scism, the trial judge remarked that he and Ms. Scism were "from the same school" and that the views of society are different today. Although the trial judge later explained that his comments were aimed at unmarried people "shacking up" or living together, there is no evidence in this record to show that Teri Parker and Dr. Sidberry lived together. Finally, we observe that as part of the final divorce judgment, the trial court ordered that the child was to have no

contact with Dr. Sidberry -- a condition that was not discussed or requested by any party to the case.[1]

In applying the Palmore decision to the present case, however, it is apparent that there are differences. First, in Palmore, custody was granted to the natural mother and the father later filed for a change in custody. Second, the trial court's ruling in Palmore was solely based on race. In contrast, this case involves an initial custody hearing and a comparison of the fitness of the two parents where evidence of a racial factor was admitted. At the post-trial hearing on the statement of evidence, the trial court denied that he considered race while excluding comments alleged to reflect racial bias. He indicated that his concern was the presence of an extramarital affair that interfered with the well-being of the child. See Sutherland v. Sutherland, 831 S.W.2d 283, 286 (Tenn. App. 1991) (sexual indiscretion does not, by itself, disqualify a parent from being awarded custody, but it may be a relevant factor if it involves the neglect of the child).

As an appellate court, we recognize that the trial court must exercise broad discretion in child custody matters. Gaskill, 936 S.W.2d at 631. We accept the trial court's statement that race did not play a part in its decision-making in awarding custody to the father. Moreover, it appears that the trial court properly weighed the relevant factors in performing the comparative fitness analysis. Although nothing before this Court indicates that either parent is unfit, the evidence in the limited record does not preponderate against the judgment awarding custody to Richard Parker. The judgment is therefore affirmed.

## CONCLUSION

We conclude that the evidence in the record before this Court does not preponderate against the trial court's judgment. The Court of Appeals' judgment,

---

[1] The Court of Appeals vacated this portion of the trial court's order after finding that it was not supported by evidence in the record. Neither party challenged the Court of Appeals' ruling in this regard, which we affirm without further discussion.

-11-

affirming the trial court's grant of custody to Richard Parker, is affirmed.  Costs of the

appeal are taxed to Teri Michelle Parker, for which execution shall issue if necessary.

-12-

_____
RILEY ANDERSON, CHIEF JUSTICE


**CONCUR:**

Drowota and Holder, JJ.
Birch, J. - see separate concurrence

Reid, Sp. J., not participating